1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DAN M. GIBSON,

        Petitioner,

v.

JOE A. LIZARRAGA,

        Respondent.

Case No. 14-cv-03717-JD

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY**

Dan Gibson, a pro se state prisoner, has brought a habeas petition pursuant to 28 U.S.C. § 2254. The Court ordered respondent to show cause why the writ should not be granted. Respondent filed an answer and a memorandum of points and authorities in support of it. Gibson filed a traverse. The petition is denied.

## BACKGROUND

On December 1, 2010, Gibson was found guilty of murder. Clerk's Transcript ("CT") at 194-95. But the jury was undecided if the murder was willful, premeditated, and deliberate. *People v. Gibson*, No. H037519, 2014 WL 1278631, at *4 (Cal. Ct. App. March 28, 2014). The trial court ordered a retrial on the applicable degree of murder pursuant to state law. *Id.* at *5. Prior to retrial the parties reached an agreement where Gibson would be sentenced for second-degree murder and the prosecution would dismiss the premeditation allegation. *Id.* Gibson was sentenced to 15 years to life in prison. *Id.*

The California Court of Appeal affirmed the judgment. *Id.* at *1. The California Supreme Court denied a petition for review on June 25, 2014. Answer, Ex. H.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

## STATEMENT OF THE FACTS

The California Court of Appeal summarized the relevant facts of the underlying crime as follows:

> At the outset, we note that the fact that appellant killed his wife on October 30, 2008, is not in dispute.  Appellant admitted to the police, to medical personnel, and in court that he had so done.  Specifically, appellant testified that he thought he "choke[d] her to death."  The main controversy in the trial court was whether the killing constituted first or second degree murder.
>
> **The Prosecution's Case**
> In the early morning hours of October 31, 2008, Grace Swearingen went outside to retrieve her morning newspaper.  Ms. Swearingen saw appellant lying on the ground.  When police officers arrived a short time later, they found appellant lying directly in front of the garage attached to 1037 Highland Street, # D.  When police entered this residence they found the screen door leading out to the third floor balcony "forced off its frame"; it appeared to have been forced out from the inside.  Officers found appellant's wife "lying in the bathtub, covered in a white comforter."  Her face was exposed and her eyes were wide open and her pupils were fixed and dilated, which indicated to one of the officers that she was dead.
>
> Appellant was taken by ambulance to the hospital.  En route a nurse asked appellant if he was in any pain.  Appellant responded by saying "'I killed my wife.'"  At the San Jose Regional Medical Center, appellant told an attending physician that he had "murdered" his wife by strangling her.  FN1
>
> > FN1  San Jose Police Officer Jonathan Gemmet was working as a security officer at the Medical Center when appellant was brought into the emergency room.  He testified that appellant was conscious and speaking to the medical staff.  As a result of what he heard appellant saying, Officer Gemmet activated his department-issued digital audio recorder and started recording what was being said.  A recording of appellants conversation with the medical staff was played for the jury.
>
> The pathologist who conducted the autopsy on Ms. Gibson testified that the cause of death was asphyxia due to strangulation.  Ms. Gibson's body showed that she had suffered various external injuries including bruises to her scalp and head, several lacerations and abrasions, a stab wound on the neck that went in no more than an inch, and a series of parallel superficial cuts, which he concluded were eight to 10 attempts to cut into her neck consistent "with a sawing motion back and forth."  Internal injuries showed that the cartilage in her neck was cracked "as though something were extremely forcefully being pressed against the front of" Ms. Gibson's neck.  Ms. Gibsons ribs were broken "all the way up and down," which he concluded was the result of someone applying "a large amount of force, like almost the full weight of a fairly heavy

2

body standing or kneeling . . . on the body. . . ."  The pathologist opined that Ms. Gibson was stabbed and had her ribs crushed post mortem.  At the time Ms. Gibson was killed she was five feet, two inches tall and weighed 108 pounds.

When Seaside Police Detectives Anderson and Martin interviewed appellant in the hospital, he told them that on October 30, 2008, he and his wife had driven to San Francisco to get the paperwork they needed to fly to the Philippines the next day.  FN2  When they returned home, they decided to take a nap before tackling the task of packing for the trip.  According to appellant, he woke up in a panic.  He and his wife talked about the trip to the Philippines and appellant told her that he would not be able to make the trip in the time he had off from work; his wife said she would go with or without him.  Appellant said that his wife told him that she had transferred all the money from their bank account to her family's account in the Philippines.

> FN2 Appellant was informed of his Miranda rights and said that he understood.

Appellant explained that he moved closer to his wife.  Specifically, he "reached, leaned over like [he] was going to kiss her;" his arm was around her neck.  Then, he "[s]queezed and squeezed."  At one point, his wife told him that he was hurting her and squeezing too tight; he squeezed harder.  Appellant said that his wife cried out for help; as she was resisting him she kicked out the screen door leading to the balcony.  His wife bit him several times during the time he was strangling her.  After choking his wife, he retrieved a knife and stabbed her in her right wrist next to the vein, he tried to stab her in the chest and throat area and "crotch area" so she would bleed out, then there would be no question that she would die.  In order to confirm that she was dead, appellant said he placed his wife face down in the bathtub filled with water and checked to see if any bubbles surfaced. However, before placing her in the bathtub he "jammed her, in her sternum" with the knife and tried to ... "break her neck" while she was in the bathtub area.

When the detectives asked appellant why he was angry with his wife, appellant told them "it was the lack of my security of her coming back.  It seemed like she had more going for her in the Philippines."  Appellant said he did not want to live without her.  According to appellant, they had not argued and his wife did not "lash out" at him or "say something or do something to make" him "upset."  Appellant explained, "it was me" and he said, "the problems were me."  He said that his wife had professed her fidelity to him "numerous times."

Appellant acknowledged that his wife "did not deserve" to die.  He felt rage when he attacked her because he "lost . . . all the money" that they shared.  However, he admitted that she had done nothing wrong.  Appellant confessed that he thought about "slicing" his wife's throat several days before he actually killed her.

In the hours after he killed his wife, appellant walked back and forth several times from his bedroom to the adjoining third-floor balcony

intending to jump off and kill himself.  After multiple unsuccessful attempts, by accident, he slipped on some water and fell from the balcony to the cement driveway below.

As a result of the fall from the balcony, appellant suffered a broken pelvis, injuries to both his legs and numerous abrasions and bruises.

**The Defense Case**

Dr. Daniel McFarland, an anesthesiologist, testified that given appellant's injuries and the drugs administered to him by medical personnel before and during the time appellant spoke to the detectives, he would have expected that appellant's brain function would have been impaired, in addition to him having "some degree of memory impairment." Dr. McFarland listened to the recording of appellant's police interview.  He noted that there were indications that appellant's mental faculties were impaired.

Several of appellant's friends and work colleagues testified that in the time leading up to the homicide, appellant had showed signs of stress from his job and was not his usual friendly self.  Some said that appellant was not a violent person. On the contrary, he was friendly and caring.

Appellant testified on his own behalf that he worked as a correctional counselor at Soledad Correctional Training Facility, a state prison.  Appellant spoke about a relationship he had with an ex-girlfriend, which he described as both limited in scope and platonic in nature.  He and the ex-girlfriend belonged to the same gym, but he would schedule his gym visits to try to avoid seeing her—not always successfully, but eventually he ended his gym visits.   However, he had accompanied her to a movie on one occasion, and he had called her on his cellular telephone—telephone calls that his wife was aware of and discussed with him.  That was a source of stress, as were work problems and the emotional problems of family members from his prior marriage.   One result of all this stress was that he could sleep only one to two hours per day; this was despite the fact that he was overdosing himself on Ambien, a sleep-inducing medication.

In the week of the killing, appellant said that he was depressed and not eating or sleeping properly; he had stopped visiting the gym.  He had taken off two weeks from work to deal with his depression and was sitting at home watching television without registering the contents of the programs.  He acknowledged that he and his wife were living beyond their financial means.

On the day he killed his wife, they drove to San Francisco to collect airplane tickets for both of them from the offices of Philippine Airlines.  Their flight was scheduled to leave the next day, Friday, October 31. They returned to their residence to pack.  Appellant said that throughout the day he told his wife that he did not want to undertake the trip.  She said she would go with or without him, although she was worried that he might contact his ex-girlfriend while she was gone if she did go alone.  The amount of things she was packing suggested to him that she did not plan to return to the United States.

Appellant testified that when he awoke from a brief nap, he saw his wife "sitting on the bed with her laptop, and she was going over some figures from what [he] could see." When he asked what she was doing, she said she was transferring all of their funds to an account held by her family. Appellant said, "She pressed . . . a button and . . . said, [n]ow we have no money in our account."

Consistent with his trial testimony, at the hospital appellant had told the detectives about his general life and work situation before the killing; and explained that because of either sleep apnea or stress, or both, he was not sleeping. Appellant had told the detectives about the situation that had occurred sometime before he killed his wife concerning him being friendly with a former girlfriend; he described the relationship he had with the former girlfriend after his marriage as platonic, but also mentioned his "infidelity." Toward the end of the interview, he had stated that his wife "had discovered I was[ ] with my ex-girlfriend." In addition, he stated that on three or four occasions he had visited "massage parlors" but his wife did not know about these visits, although he suspected that she might have known. In any event, possibly "the whole week of her demise" they were arguing or having discussions about the ex-girlfriend. At the same time, he felt jealous of the possible consequences of her ability to associate with celebrities and wealthy business executives through her job at an exclusive resort. He wondered, "what do I have to offer, when you live paycheck by paycheck and so does she[?]" His wife told him that if he loved her he would accompany her on a trip to her native Philippines.

Appellant had explained to the detectives that he viewed the trip to the Philippines as "her way to get out of the marriage," a marriage he wanted to fix; from his perspective he thought "[his] actions . . . in the past, had warranted" her plan to go to the Philippines. However, he "didn't want to go to the Philippines." Before they took a nap, they were arguing about his lack of commitment to go to the Philippines and, he "realized at this point" that their "relationship was over."

Toward the end of the interview, appellant had told the detectives that his wife had not done anything wrong and that he "definitely" had. He summarized by saying he committed the killing because he "wanted security"; and "didn't want to . . . live without her." In addition, he killed her out of "[j]ealousy" of all the people that she "associate[d] with."

Appellant had told the detectives during the interview that he decided he "had no right to . . . live." He went out onto the balcony to jump off and kill himself. He said that before he could leap off volitionally, which he was having trouble doing, he slipped and fell involuntarily. He predicted he would "probably go on death row . . . or [be] put in prison for life." FN3

> FN3 The recording of appellant's interview with Detectives Anderson and Martin was played for the jury.

United States District Court
Northern District of California

5

1
2
3
4
5
6
7

Appellant testified that when he asked his wife if she was going to come back from the trip to the Philippines, she said that she would not. As a result, he "felt [he] was out of control" because he "was losing everything that was important to" him. During cross-examination, appellant stated that when he asked his wife why she had transferred their funds, she told him that she was leaving him. The prosecutor handed appellant a statement for his and his wife's joint bank account for October 1 through October 31, 2008. Appellant looked at the statement and agreed that it did not show any emptying of the account. Further, appellant admitted that he did not ask his wife to try to reverse the transfer. Appellant acknowledged that on the day he killed his wife, the discussions he was having with her concerning their impending trip were conducted in a "conversational tone."

8
9

In rebuttal, a police officer who had collected evidence from the couple's bedroom found a laptop computer "in a small hutch-like desk next to the bed." The computer's lid was closed.

10

*Gibson*, 2014 WL 1278631, at *1-4.

11

**STANDARD OF REVIEW**

12      A district court may not grant a petition challenging a state conviction or sentence on the

13   basis of a claim that was reviewed on the merits in state court unless the state court's adjudication

14   of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable

15   application of, clearly established Federal law, as determined by the Supreme Court of the United

16   States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in

17   light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first

18   prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*,

19   529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual

20   determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

21      A state court decision is "contrary to" Supreme Court authority only if "the state court

22   arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if

23   the state court decides a case differently than [the Supreme] Court has on a set of materially

24   indistinguishable facts." *Williams*, 529 U.S. at 412-13. A state court decision is an "unreasonable

25   application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it

26   correctly identifies the governing legal principle from the Supreme Court's decisions but

27   "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal

28   court on habeas review may not issue the writ "simply because that court concludes in its

independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ.  *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."  *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).  Moreover, in conducting its analysis, the federal court must presume the correctness of the state court's factual findings, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

The state court decision to which § 2254(d) applies is the "last reasoned decision" of the state court.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005).  When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion.  *See Nunnemaker* at 801-06; *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).

## DISCUSSION

As grounds for federal habeas relief, Gibson asserts that: (1) the trial court violated his rights by failing to instruct the jury on voluntary manslaughter; (2) the trial court erred by admitting into evidence his confession to the police that was in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966); (3) trial counsel was ineffective for failing to request certain jury instructions; and (4) he was deprived of a fair trial due to the cumulative error from the prior claims.

## I.    VOLUNTARY MANSLAUGHTER JURY INSTRUCTION

Gibson argues that the trial court violated his right to due process by denying his request for a heat of passion voluntary manslaughter jury instruction.

### Background

During opening statements Gibson's trial counsel told the jury that Gibson did a terrible thing that fits the classic definition of voluntary manslaughter.  *Gibson*, 2014 WL 1278631, at *10.  However, the trial court did not issue a voluntary manslaughter instruction.  The instruction at

United States District Court
Northern District of California

issue, CALCRIM No. 570 states:

> A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.
>
> The defendant killed someone because of a sudden quarrel or in the heat of passion if:
>
> 1.  The defendant was provoked;
>
> 2.  As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment;
>
> AND
>
> 3.  The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.
>
> Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.
>
> In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.
>
> It is not enough that the defendant simply was provoked. The defendant is not allowed to set up (his/her) own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.
>
> [If enough time passed between the provocation and the killing for a person of average disposition to "cool off" and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.]
>
> The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder.

Judicial Council of California Criminal Instruction No. 570.

The California Court of Appeal set forth the background for this claim:

> Defense counsel moved for a voluntary manslaughter instruction, but the trial court denied the motion. In rejecting the requested instruction, the trial court discussed cases it viewed as instructive, including *People v. Moye* (2009) 47 Cal. 4th 537 (*Moye*), *People v. Steele* (2002) 27 Cal. 4th 1230, and *People v. Berry* (1976) 18 Cal. 3d 509 (*Berry*). The court stated that as far as the objective component of the voluntary manslaughter test is concerned, "[t]he only factors that can be considered, in this Court's estimation, are the factors that the victim caused." The court noted that there were two possible victim-caused passion-inducing factors—the victim purportedly telling defendant that (1) she did not intend to return from the Philippines and (2) she had emptied the couple's joint bank account, transferring the money to an account belonging to her family over which appellant had no control. The court went on to say, with regard to the first factor-her leaving, "is that reasonably objective-is that the kind of thing that would cause a reasonably objective individual to react with this kind of killing passion? And the answer to that is no." Similarly, with regard to the bank account being emptied the court questioned, "[i]s that conduct sufficient to raise a killing instinct or conduct on the part of a reasonably objective person? And the answer to that is no."

> After further discussion, the trial court stated that it did not recall "any testimony by anybody, at any time, that [the victim] even raised her voice. It's just not there. There is no taunting. There were discussions. He-the defendant, in his taped statement, talked about it more than he did in his court testimony. He talked about there being these discussions or concerns that she expressed about the gal at the gym. But even those discussion[s] were-weren't described as loud or angry, just unhappy, I guess. [¶] . . . I just don't see anything in the evidence that would justify giving manslaughter, voluntary manslaughter instructions, so the Court is not going to give it. The request to give it is denied."

> [V]ery shortly after the jury retired to deliberate, the jury sent a note asking the court, "Is voluntary manslaughter still an option? Are the options: [¶] 1. 1st degree murder[.] [¶] 2. 2nd degree murder[.] [¶] 3. manslaughter[.] [¶] 4. acquittal[.]" Again, defense counsel argued that the court should instruct on voluntary manslaughter, "especially now that the jury is asking about it." The court rejected the argument. Instead, the court convened the jury in the courtroom and instructed the jury that the informal answer to the question was "the options are: first-degree murder, second-degree murder, acquittal, and no decision. Manslaughter is not an option. All right? [¶] And then, more formally, I'm going to give you a further instruction. The possible options are: [¶] One, Count 1, the options there are guilty or not guilty of murder. If you unanimously agree on a verdict, complete the verdict form accordingly. If all twelve jurors cannot agree on a verdict, please inform the bailiff. [¶] Two, if the jury finds the defendant guilty of murder, then the question remains as to whether . . . it is willful, deliberate, and premeditated murder. If you are able to reach a unanimous agreement as to whether such murder is or is not willful, deliberate, and premeditated, complete

the special finding on the verdict form.  If you cannot reach a unanimous agreement, please inform the bailiff that you cannot reach a decision as to the special finding."

*Gibson*, 2014 WL 1278631, at *5-6.

The jury deliberated for approximately 19 hours, finding Gibson guilty of murder, but was undecided whether the murder was willful, premeditated, and deliberate.  The trial court ordered a retrial on the applicable degree of murder pursuant to state law but the parties reached an agreement where Gibson would be sentenced for second-degree murder and the prosecution would dismiss the premeditation allegation.

**Legal Standard**

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings.  *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).  The failure of a state trial court to instruct on lesser-included offenses in a noncapital case does not present a federal constitutional claim.  *See Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000).  However, "the defendant's right to adequate jury instructions on his or her theory of the case might, in some cases, constitute an exception to the general rule."  *Solis*, 219 F.3d at 929 (citing *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984)).  *Solis* suggests that there must be substantial evidence to warrant the instruction on the lesser-included offense.  *See Solis*, 219 F.3d 929-30 (no duty to instruct on voluntary manslaughter as lesser-included offense to murder because evidence presented at trial precluded a heat of passion or imperfect self-defense instruction; no duty to instruct on involuntary manslaughter because evidence presented at trial implied malice).

Due process does not require that an instruction be given unless the evidence supports it.  *See Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005).  The defendant is not entitled to have jury instructions raised in his or her precise terms where the given instructions adequately embody the defense theory.  *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996).  To obtain relief for the state court's refusal to give an instruction, the error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment.  *See Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988).

**Discussion**

The California Court of Appeal discussed applicable state law and denied this claim:

> In this case, just before the homicide, appellant's wife had (a) indicated that she had transferred all of the money in the joint account to her family's account, and (b) indicated that she might stay in the Philippines after their trip, rather than return to the United States with appellant.  The question in this case is do these two facts together constitute legally sufficient provocation-the kind of provocation that "'would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from . . . passion rather than from judgment.'" (*Beltran*, *supra*, 56 Cal. 4th at p. 948.)
>
> "A heat of passion theory of manslaughter has both an objective and a subjective component. [Citations.]" (*Moye*, *supra*, 47 Cal. 4th at p. 549.)
>
> ""'To satisfy the objective or 'reasonable person' element of this form of voluntary manslaughter, the accused's heat of passion must be due to 'sufficient provocation.'" [Citation.]'  [Citation.]  '[T]he factor which distinguishes the "heat of passion" form of voluntary manslaughter from murder is provocation.  The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation] or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.]  The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection.  [Citations.]'  [Citation.]" (*Moye*, *supra*, 47 Cal. 4th at pp. 549-550.)
>
> "To satisfy the subjective element of this form of voluntary manslaughter, the accused must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation. [Citation.]" (*Moye*, supra, at p. 550.)  ""'However, if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter. . . .'" [Citation.]'  [Citation.]" (*Ibid*.)
>
> Appellant contends the "dual provocation" present in this case is legally sufficient to meet the objective component of provocation under a heat of passion theory.  Appellant compares his wife's threat to not return from the Philippines with examples of infidelity in the case law.  Citing to *Berry*, *supra*, 18 Cal. 3d 509 and *People v. Borchers* (1959) 50 Cal. 2d 321 (*Borchers*), appellant argues that a wife's announcement to her husband that she is leaving him is very much the sort of provocation that would cause a husband to act rashly and without deliberation.
>
> . . .
>
> In contrast to *Berry*, *Borchers* and *Le*, here, there was absolutely no evidence that appellant's wife was engaged in any extramarital

affair, or that she was leaving him for another man; there were no allegations of recent infidelity, and appellant did not claim such thoughts were in his mind when he killed his wife. Further, there was no evidence that she taunted him or even that they had had a heated argument. To the contrary, appellant testified that his wife had not lashed out at him, and had not said something or done something to make him upset. Rather, it was his own insecurity that caused him to become enraged; he did not want to live without his wife. Further, appellant told the police he was angry with his wife because he was afraid she was going to leave him; he felt he could not survive without the money, but he did not feel that she had fooled him.

In essence, appellant is asking this court to agree that there is legally sufficient provocation when the provocation is the bare act of one spouse saying they are leaving the marriage, and they are taking marital money. Respectfully, without more, this we decline so to do. "Adequate provocation" goes "'beyond that degree within which ordinary men have the power, and are, therefore, morally as well as legally bound to restrain their passions.'" (*See Beltran*, *supra*, 56 Cal. 4th at p. 947.) The two statements-I'm not coming back from the Philippines and I have transferred all our money to another account-comprised the only evidence of provocative conduct attributed to the victim; plainly these statements were insufficient to cause an average person to become so inflamed as to lose reason and judgment. (*See People v. Bufarale* (1961) 193 Cal. App. 2d 551, 562 (*Bufarale*) [the evidence did not support theory of heat of passion killing when the alleged provocation consisted of the victim's rejection of defendant's continued attentions and her decision to live with her husband].) Were it otherwise, we would see a greater correlation between the divorce rate and the homicide rate. FN7 "Mere unrestrained and unprovoked rage, or a 'heat of passion' to wreak vengeance, of a legally sane although emotionally unstable or nervous person is no defense to homicide." (*People v. Danielly* (1949) 33 Cal. 2d 362, 377.)

> FN7 By this we do not mean that the provocation must be sufficient to cause a reasonable person to kill as the dissent implies. Rather, we mean that if the bare act of one spouse saying they are leaving the marriage, and they are taking marital money is sufficient to cause a reasonable person to act out of passion rather than from reason and judgment we would likely see a greater correlation between the divorce rate (one spouse leaving and taking marital money) and the homicide rate (the other spouse reacting out of passion rather than from reason and judgment and then killing the other spouse).

In sum, in this case, there was no substantial evidence supporting the need for a "heat of passion" voluntary manslaughter instruction.

*Gibson*, 2014 WL 1278631, at *7-9 (footnote omitted).

1    The California Court of Appeal also held that even if the trial court erred by failing to give

2    the voluntary manslaughter instruction, any error was harmless:

3        Finally, even if we were to agree with appellant that the court should
         have instructed on voluntary manslaughter based on heat of passion,
4        we believe any error in failing to give such an instruction was
         harmless. . . .
5
         . . .
6
         Appellant bases his prejudice analysis on three things-the jury
7        question concerning voluntary manslaughter, "weak" evidence of
         malice, and the length of the jury deliberations.
8
         Appellant places much reliance on the fact that the jury sent a note
9        asking if voluntary manslaughter was still an option to argue that in
         this case there is a strong likelihood that if the court had instructed
10       on voluntary manslaughter, the jury would have convicted him of
         that rather than murder.  In context, this request is not as significant
11       as appellant suggests.

12       First, during opening statements defense counsel told the jury that
         "in this case you'll learn that this man, this 60–year–old man with no
13       criminal record, did a terrible thing.  And you'll hear through the
         instruction that this will fit the classic definition of voluntary
14       manslaughter, which he should be held accountable for."  Thus, the
         jury was told that it would be considering voluntary manslaughter.
15       The trial court did not decide whether to give the voluntary
         manslaughter instruction until the end of trial.  It is significant that
16       the jury asked whether voluntary manslaughter was still an option,
         rather than simply asking if it was an option.
17
         Second, the jury asked about voluntary manslaughter shortly after it
18       began deliberating.  After learning that voluntary manslaughter was
         not an option, the jury deliberated for approximately 17 more hours
19       over four more days.  Eventually, the jury reported that it was
         divided over whether to convict appellant of first-degree murder or
20       second-degree murder.  Thus, it appears the jury struggled over
         whether the murder was deliberate and premeditated, not over
21       whether it could convict appellant of a lesser offense.

22       As to appellant's claim that the evidence of malice aforethought was
         very weak, we are not persuaded that it was.  Appellant told the
23       police that he thought about stabbing his wife to death several days
         before he killed her; and during the time he was strangling her, he
24       ignored her pleas for help.  Further, despite the fact that she bit him
         several times and struggled to the point where she kicked out the
25       screen door appellant continued to strangle her until she was dead.
         (See Shakleford v. Hubbard (9th Cir. 2000) 234 F.3d 1072, 1078–
26       1079 [where evidence showed that the defendant strangled the
         victim to death, jury had to have found malice where a pathologist
27       testified it took at least 10 minutes for the victim to die and evidence
         showed that the defendant listened to the victim's sobs as he
28       strangled her until she died].)   "[H]omicide by strangulation

United States District Court
Northern District of California

13

indicates malice. . . ." (*People v. La Vergne* (1966) 64 Cal. 2d 265, 272; *see also People v. Caldwell* (1955) 43 Cal. 2d 864, 869.)  Thus, the element of implied malice-a prerequisite to the offense of murder in the second degree-was more than sufficiently established by proof of the vicious and brutal manner of the killing.

Finally, appellant places much reliance on the fact that the jury deliberated for "some 23 hours" to argue that here the jury was faced with a difficult decision and had the court instructed with voluntary manslaughter, the jury, faced with the uncontroverted fact that he killed his wife, would have elected to convict him of that rather than murder as a less undesirable alternative to letting him go free.  We are not persuaded that such is the case.

First, as noted ante, the actual time the jury deliberated was closer to 19 hours.  Further, during that time, the jury posed numerous questions for the court-including six questions indicating the jury was wrestling with the question of whether the crime was first or second degree murder-and requested to hear the recording of appellant's police interview, be provided with photocopies of the definition of first degree murder and second degree murder, have appellant's testimony read back, and the testimony of the anesthesiologist.  It seems logical that such time should not be included in the time calculated for deliberation because during such time the jury was not actually deliberating the case, but was listening to the testimony that was being read back and the recording of appellant's police interview.  Furthermore, as indicated by the aforementioned questions, we must assume that the jury spent time going over their instructions to make sure that they were properly carrying out their duties; that is making sure that they understood the difference between first and second degree murder.

Appellant cites our Supreme Court's conclusion that deliberations of almost 12 hours were an indication that a case was not "open and shut." (*People v. Cardenas* (1982) 31 Cal.3d 897, 907.)  However, the length of a jury's deliberation is related to the amount of information presented at trial. (People v. Houston (2005) 130 Cal.App.4th 279, 301.)  Here, the record indicates that there were extensive trial proceedings involving over two dozen witnesses occurring on five different days, over 100 exhibits were admitted into evidence, as well as lengthy closing arguments and several pages of jury instructions.  The jury's deliberation of this mass of information over the course of four days speaks only for its diligence; it adds nothing to appellant's prejudice argument.

Given the fact that there was evidence that the source of appellant's anger was his desire to not live without his wife, the strength of the evidence of malice in this case, and the fact that at least some of the jurors thought that there was evidence of premeditation and deliberation, we conclude that any failure to give a voluntary manslaughter instruction was harmless beyond a reasonable doubt. In other words, it appears beyond a reasonable doubt that the assumed error did not contribute to the particular verdict at issue.

*Gibson*, 2014 WL 1278631, at *9-11 (footnote omitted).

1    There is no Supreme Court authority stating that a defendant is entitled to a lesser-included

2    jury instruction in a noncapital case.   The failure of a state trial court to instruct on lesser-included

3    offenses in a noncapital case does not present a federal constitutional claim.  *See Solis*, 219 F.3d at

4    929.  While *Solis*, a Ninth Circuit case, suggests there could be an exception to this general rule,

5    there must be substantial evidence to warrant the instruction on the lesser-included offense.  *Id*. at

6    929-30.  However, a state court's determination that as a matter of state law, there was insufficient

7    evidence to warrant the requested jury instruction, "should be the final word on the subject."

8    *Menendez*, 422 F.3d at 1029.

9    In this case, the California Court of Appeal engaged in a detailed analysis of state law and

10   found that Gibson's reasons for requesting the instruction were insufficient because there was no

11   evidence to support sudden quarrel or heat of passion.  Gibson has failed to demonstrate that the

12   state court's decision was objective unreasonable.  The state court noted that there were no

13   allegations of recent infidelity by the victim, and Gibson did not claim such thoughts were in his

14   mind when he killed her.  *Gibson*, 2014 WL 1278631, at *9.  There was no evidence that she

15   taunted him or even that they had had a heated argument.  *Id*.  Gibson testified that his wife had

16   not lashed out at him, and had not said something or done something to make him upset.  *Id*.

17   Rather, it was his own insecurity that caused him to become enraged; he did not want to live

18   without his wife.  *Id*.

19   The California Court of Appeal also found that even assuming it was an error not to issue

20   the jury instruction, any error was harmless.  If a state court finds an error harmless, that

21   determination is reviewed under the deferential AEDPA standard.  This means that relief is not

22   available for the error unless the state court's "*harmlessness determination itself* was

23   unreasonable." *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015) (quoting *Fry v. Pliler*, 551 U.S. 112,

24   119 (2007)).  In other words, a federal court may grant relief only if the state court's harmlessness

25   determination "was so lacking in justification that there was an error well understood and

26   comprehended in existing law beyond any possibility for fairminded agreement."  *Id*. (quoting

27   *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  And if the federal court determines that the state

28   court's harmless error analysis was objectively unreasonable, it also must find that the error was

United States District Court
Northern District of California

15

1   prejudicial under *Brecht* before it can grant relief.  *See Fry*, 551 U.S. at 119-20 (§ 2254(d)(1) did

2   not displace *Brecht*).

3          Gibson has failed to demonstrate that the state court's harmless error holding was

4   objectively unreasonable.  Nor has he shown that the error was prejudicial under *Brecht*.  The state

5   court found that it appeared the jury was struggling over premeditation and whether the crime was

6   first or second degree murder, not if Gibson should be convicted of a lesser offense.  *Gibson*, 2014

7   WL 1278631, at *10.  While the jury sent a note inquiring if voluntary manslaughter was an

8   option, the California Court of Appeal noted this was most likely in response to Gibson's trial

9   counsel arguing for voluntary manslaughter in opening arguments.  The California Court of

10  Appeal also found there was a great deal of evidence to support the elements of murder.  Gibson

11  has failed to show that the state court's harmlessness determination was objectively unreasonable.

12  This claim is denied.

13  **II.**       **CONFESSION**

14         Gibson next argues that the trial court erred by admitting into evidence his confession to the

15  police that was in violation of *Miranda*.

16         **Background**

17  The California Court of Appeal set forth the relevant background:

18            On the afternoon of October 31, 2008, after being advised of
             appellant's admissions about the killing to hospital staff and the San
19           Jose police officer, the interviewing detectives from Seaside went to
             the hospital.  As noted, *ante*, they advised appellant of his *Miranda*
20           rights, he waived them, and he spoke for about an hour and a half.
             The next day, when law enforcement authorities again sought to
21           question defendant, he invoked his Miranda rights and questioning
             stopped.
22
             Before the detectives began questioning appellant about the killing
23           of his wife, Seaside Police Department Detective Dan Martin and
             appellant discussed appellant's *Miranda* rights.  Specifically, the
24           following colloquy occurred.

25           "Martin: . . . [B]efore we start talking about [what happened] . . .
             I'm going to read you some procedural stuff, OK?  I'm sure you're
26           aware of what, what has to be read to you under these
             circumstances.  Um, [all right]?

27           "Gibson: Yes.

28

United States District Court
Northern District of California

"Martin: So, if you don't understand anything I'm telling you, just let me know.  [Okay.]  You have the right to remain silent.  Do you understand that?

"Gibson: Yes.

"Martin: Anything you say can be used against you in the court of law.  Do you understand that?

"Gibson: Yes.

"Martin: Uh, you have the right to consult with a lawyer before answering any questions, and to have a lawyer with you during any questioning. Do you understand that?

"Gibson: Yes.

"Martin: Uh, if you cannot afford one, a lawyer, one will be provided to you for free of cost if you want one.  Do you understand that?

"Gibson: Yes.

"Martin: [Okay.]"

Before trial, appellant moved to exclude the statements he made from his hospital bed to the detectives.  In addition, he sought to exclude his statements to all other medical personnel who treated him.

At a pretrial hearing on appellant's motion, Dr. Daniel McFarland testified on appellant's behalf that the combination of his serious injuries and drugs administered to him rendered him incapable of, in the words of defense counsel, "knowingly participating [in] and/or making intelligent decisions."

Dr. McFarland had not treated appellant.  Rather, he had reviewed various records that formed the basis for his testimony.  He testified that appellant had a closed head injury, a general term meaning that his head had hit something during his fall from the balcony.  As a result, he had a diminished level of consciousness when treated initially by first responders.

According to Dr. McFarland, appellant's consciousness level measured at 15 out of 15 possible points under a standard scoring method during his transport to the hospital, which began around 7:10 a.m. on October 31, 2008.  However, that did not mean his brain was functioning normally.  He should have been able to answer basic questions such as whether he was allergic to drugs, had ever had surgery, was currently using any medications, or was under a doctor's care.

During transport, appellant was administered two powerful drugs, the analgesic Fentanyl and the sedative Versed, but in modest doses.  He received four milligrams of morphine sulfate in the emergency room at 8:10 a.m.  Nevertheless, about 8:30 a.m. he rated his pain

17

level at 10 out of a possible 10.

According to Dr. McFarland, appellant's condition remained poor throughout the morning. At 11:00 a.m., his blood pressure was 77/49, which indicated serious internal bleeding. At noon it was 78/38.

The two detectives started to interview appellant at 12:25 p.m. At 1:07, while the interview was still in progress, appellant started receiving a blood transfusion aimed at raising his blood pressure.

Dr. McFarland testified that the brain cannot work normally with blood pressure as low as appellant's was at the start of the interview. Appellant would have been in hypovolemic shock. His brain functioning would have been further impaired by his head injury. Finally, the Fentanyl, Versed, and morphine would have prolonged effects because appellant's liver and kidneys could not have metabolized them normally.

Dr. McFarland testified that the next day, i.e., November 1, 2008, before appellant declined to speak to the detectives, he was confused about whether he had left the hospital at some point and could not recall what he had told them the previous day, even though his medical condition was better and he was being helped by morphine. His mental state was still in flux, but when he invoked his rights on November 1, he was lucid.

Finally, Dr. McFarland concluded that as a result of the foregoing— and as medical records, the audio recording of appellant's conversations, and the interview transcripts showed—appellant's "level of consciousness and the clarity of his mentation [were] highly variable from moment to moment." Dr. McFarland went on to say that at times appellant "would appear lucid and cogent. . . . And other times he would respond to a question, particularly ones that involved more than a one[-]word answer, with information that was completely irrelevant." Appellant would have been incapable of making "legally binding decisions, like entering [into] a contract or . . . signing a medical release." In sum, appellant "exhibited . . . the waxing and waning mental status that is typical of patients with his constellation of medical difficulties."

However, Dr. McFarland testified that from listening to the audio recording of appellant's hospital interview, he felt that when appellant was read his *Miranda* rights, he "could not discern anything in the tone of [appellant's] voice or the clarity of his speech that was unusual at that point. What was unusual was that his responses were slow and delayed." Also, Dr. McFarland had not interviewed appellant about his hospital stay, nor had he spoken with anyone who spoke to appellant in the hospital.

The San Jose police officer who was working in the emergency room when appellant arrived testified at the same pretrial hearing on appellant's motion to exclude the evidence of his statements. The officer described hearing appellant tell people that he had murdered and strangled his wife. Appellant's statements were all volunteered; the police officer testified, "I was being very mindful that I did not

want to initiate questions, which would also include not encouraging other people to ask him incriminating questions, so I stood by silently with the recorder on."

The flight nurse who attended to appellant during his helicopter ride to San Jose also testified at the exclusion hearing. He felt that appellant was malingering, that is he was feigning a level of neurological disability that he was not experiencing.

With the acquiescence of defense counsel, the trial court accepted the prosecution's offer of proof that if called to testify, the two detectives would state that "during the entire time that they were speaking with [appellant] . . . his answers were appropriate to questions" and "it was clear to them that he was willing to talk," and in fact "in their opinion he was very much willing to talk," but "sometimes he would go off on tangents about the pressures on him and they would refocus him. . . ."

The court found that *Miranda* was waived and that appellant's statements were voluntary. Accordingly, the court denied the motion to exclude appellant's statements he made after he killed his wife. The court reasoned that in contrast to a young, immature, and emotionally stressed suspect, appellant was older and was a prison guard with a greater understanding of the consequences of invoking or waiving his *Miranda* rights. He did not appear confused at the time he waived his rights. His account of events was detailed. The court did not believe that appellant lost consciousness or landed on his head, although his head may have struck the pavement after another part of his body incurred the initial impact with the ground.

*Gibson*, 2014 WL 1278631, at *11-13.

**Legal Standard**

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that certain warnings must be given before a suspect's statement made during custodial interrogation can be admitted in evidence. Involuntary confessions in state criminal cases are inadmissible under the Fourteenth Amendment. *Blackburn v. Alabama*, 361 U.S. 199, 207 (1960). The voluntariness of a confession is evaluated by reviewing both the police conduct in extracting the statements and the effect of that conduct on the suspect. *Miller v. Fenton*, 474 U.S. 104, 116 (1985); *Henry v. Kernan*, 197 F.3d 1021, 1026 (9th Cir. 1999).

To determine the voluntariness of a confession, the court must consider the effect that the totality of the circumstances had upon the will of the defendant. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226-27 (1973). "The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper

19

inducement so that the suspect's will was overborne." *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988) (*citing Haynes v. Washington*, 373 U.S. 503, 513-14 (1963)); *United States v. Heller*, 551 F.3d 1108, 1112-13 (9th Cir. 2009) (defendant's argument that his ingestion of Tylenol with codeine the morning of his confessions rendered his confessions involuntary rejected:  defendant didn't tell officers that he took meds, defendant appeared to be alert and able, atmosphere of interview was friendly and cordial, interview was only 2 hours, and defendant was repeatedly told that he was free to leave.)

   "A statement may not be admitted if because of mental illness, drugs, or intoxication, the statement was not the product of a rational intellect and a free will." *United States v. Kelley*, 953 F.2d 562, 565 (9th Cir. 1992) (being on the verge of heroin withdrawal was held insufficient to demonstrate involuntariness where the defendant exhibited the ability to think rationally and where there were no circumstances of coercion), *disapproved on other grounds*.  However, individuals going through heroin withdrawal can voluntarily waive their *Miranda* rights and confess.  *See United States v. Rodriguez-Rodriguez*, 393 F.3d 849, 855 (9th Cir. 2005) (*Miranda* waiver voluntary during interview while defendant undergoing "mild or moderate" heroin withdrawal but "was coherent," "spoke and interacted," and "seemed normal" to officers), *overruled on other grounds*; *see also United States v. Heller*, 551 F.3d 1108, 1112-13 (9th Cir. 2009) (affirming district court's rejection of defendant's contention that his confession was involuntary due to combination of medication which led him to make bad decisions, slowed him down, and made him sleepy, and being in small meeting room for extended period of time); *United States v. Martin*, 781 F.2d 671, 672-74 (9th Cir. 1985) (statements made to police at a hospital were voluntary despite a defendant's being in pain and under the influence of Demerol, a pain-killing medication, where he was conscious, relatively coherent during the questioning, and sat up and spoke freely).

   A state court's determination that a defendant knowingly and intelligently waived his *Miranda* rights is entitled to a presumption of correctness. *Amaya–Ruiz v. Stewart*, 121 F.3d 486, 495 (9th Cir. 1997), *overruled on other grounds*.  While voluntariness is a legal question meriting independent consideration on federal habeas review, a state court's subsidiary factual conclusions

1    are entitled to the presumption of correctness.  *See Rupe v. Wood*, 93 F.3d 1434, 1444 (9th Cir.

2    1996).  Where a state court has rejected a *Miranda* claim on the merits, federal habeas relief may

3    be granted only if the state court's application of *Miranda* was objectively unreasonable.

4    *Hanneman v. Attorney General of Nevada*, 489 Fed. App'x 189, 189-90 (9th Cir. Dec. 6, 2012).

5              **Discussion**

6              The California Court of Appeal discussed the pertinent state law and denied this claim:

7                        Appellant claims that the trial court erred by allowing the
8                        prosecution to introduce into evidence his inculpatory statements
                         made in the hospital, evidence that in his view was obtained in
9                        violation of *Miranda*, *supra*, 384 U.S. 436.  Appellant rests this
                         claim on a factual argument that his physical and mental conditions
10                       were too poor for him to be able to knowingly and intelligently
                         waive his constitutional right not to incriminate himself.

11                       . . .

12                       As noted by Dr. McFarland, appellant's level of lucidity varied
                         during the interview.  While being evacuated to the hospital he gave
13                       the flight nurse a delusional account-though possibly a feigned one-
                         that the police precipitated his fall from the balcony by spraying a
14                       slippery substance on it.  At the same time, Detective Martin went
                         through each of appellant's Miranda rights in a careful and
15                       measured way; and the transcript shows appellant considered each
                         right and waived it in a linguistically appropriate manner.  The most
16                       Dr. McFarland could say about the colloquy was that appellant's
                         responses sounded slow and delayed on the audio recording of the
17                       interview.

18                       The essence of appellant's claim is not that his statements were
                         made involuntarily, but that he lacked the capacity to agree to make
19                       them.  This parsing of a claim comports with the analysis set forth
                         by other courts.  "The inquiry into whether an individual waived
20                       effectuation of the rights conveyed in the *Miranda* warnings has two
                         distinct dimensions."  (*U.S. v. Cristobal* (4th Cir. 2002) 293 F.3d
21                       134, 139 (*Cristobal*).)  "[A] waiver may very well have been
                         voluntary (that is, uncoerced) and yet given without a knowing and
22                       intelligent waiver of *Miranda* rights. . . ."  (*Id.* at p. 142.)  Thus "it is
                         not enough for us to find that [a suspect] voluntarily waived his
23                       rights.  We must also determine whether the waiver was knowing
                         and intelligent.  Unlike the issue of voluntariness, police
24                       overreaching (coercion) is not a prerequisite for finding that a
                         waiver was not knowing and intelligently made."  (*Ibid.*)

25
26                       . . .

27                       As noted *ante*, it was the prosecution's burden to establish the
                         validity of appellant's *Miranda* waiver by a preponderance of the
28                       evidence, and whether it met that burden is a determination we make

on appeal after examining the totality of the circumstances.  (*People v. Williams*, *supra*, 49 Cal. 4th at p. 425.)  On the record before this court, we find that the prosecution carried that burden.  Appellant's waiver language was unequivocal: he kept answering "yes" to the question "do you understand that?"  His account to detectives was detailed and precise and it comported with his trial testimony in many respects.  During the questioning, a hospital staff member commented, "he seems very awake, very alert."  Against this, appellant did say at one point he was "getting everything mixed up," but at least he recognized what he was doing.  However, Dr. McFarland stated that although "his level of consciousness and the clarity of his mentation was highly variable from moment to moment," at the time appellant was read his *Miranda* rights he "could not discern anything in the tone of his voice or the clarity of his speech that was unusual at that point.  What was unusual was that his responses were slow and delayed."  As noted, Dr. McFarland had not interviewed appellant about his hospital stay or talked to anyone who had spoken with appellant in the hospital.

In sum, we conclude that the trial court did not err in allowing the prosecution to present evidence of appellant's inculpatory extrajudicial statements.  (*See also People v. Breaux*, *supra*, at pp. 299-301 [defendant shot twice and morphine administered at the hospital; defendant's condition not life-threatening and his pain level moderate; despite his impaired mental and physical condition, he waived his *Miranda* rights knowingly and voluntarily before police questioning at the hospital]; *People v. Jackson* (1989) 49 Cal.3d 1170, 1189.)

*Gibson*, 2014 WL 1278631, at *13-17 (footnote omitted).

Gibson has failed to show that the state court decision was objectively unreasonable.  The California Court of Appeal engaged in a detailed analysis of the totality of the circumstances surrounding the statement to police.  The state court found that Gibson answered all the questions with detailed answers involving his and his wife's work history, problems he was having at work, and information concerning his ex-girlfriend, his daughter, and the activities for the entire week prior to the murder and the day of the murder.  While Gibson was in the hospital and had been given pain medication, he was alert and his answers were detailed and coherent.  A review of the transcripts of the interview with police supports the state court's findings.

Nothing in the record supports Gibson's argument that his waiver of his *Miranda* rights was anything but knowing, intelligent, and voluntary.  *See, e.g.*, *Matylinsky v. Budge*, 577 F.3d 1083, 1095 (9th Cir. 2009) (Supreme Court has never said that impairment from drugs, alcohol, or other similar substances necessarily affects waiver of *Miranda* rights; intoxicated individual can give knowing and voluntary waiver, so long as waiver is given by the individual's own free will).

22

The Court finds that, "the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct" of Gibson, support a finding that his waiver was not the result of physical and mental conditions that were too poor for him to understand the nature of the waiver. *North Carolina v. Butler*, 441 U.S. 369, 374-75 (1979).

While Gibson was in pain and had been provided medication by medical staff, he was detailed and clear in his response to police questions and in his response to the *Miranda* questions. In addition, Gibson worked in law enforcement at a state prison for more than eighteen years and was a peace officer. CT at 310-11; *Gibson*, 2014 WL 1278631, at *15. The state court was not objectively unreasonable in denying this claim and looking to the totality of the circumstances, including Gibson's law enforcement background and his detailed and coherent answers to questioning, his *Miranda* rights were not violated.

Even assuming it was error to admit the statements, relief is not available if the error is harmless. *See Arizona v. Fulminante*, 499 U.S. 279, 295 (1991) (holding that the introduction of a confession obtained in violation of *Miranda* is reviewed for harmless error); *Ghent v. Woodward*, 279 F.3d 1121, 1126 (9th Cir. 2002) (applying *Brecht v. Abrahamson*, 507 U.S. 619 (1993) to *Miranda* claim). The harmless error analysis looks to whether the error "had a substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507 U.S. at 623. Even if the statements had not been admitted, the evidence supported a finding of second degree murder based on Gibson's other statements and the fact that his wife was strangled, her neck was broken, and she had been stabbed. This claim is denied.

## III.    INEFFECTIVE ASSISTANCE OF COUNSEL

Gibson also argues that trial counsel was ineffective for failing to request a jury instruction advising the jury that the prosecutor's questions to the defense character witnesses did not constitute evidence.

### Background

The California Court of Appeal set forth the relevant background:

> Appellant claims that the trial court should have instructed the jury
> with CALCRIM No. 351, which provides, "The attorney for the
> People was allowed to ask defendant's character witness[es] if

United States District Court
Northern District of California

(he/she/they) had heard that the defendant had engaged in certain conduct.  These 'have you heard' questions and their answers are not evidence that the defendant engaged in any such conduct.  You may consider these questions and answers only to evaluate the meaning and importance of (the/a) character witness's testimony."

As noted, appellant presented numerous witnesses who testified to his good character and non-violent nature.  While cross examining these witnesses, the prosecutor asked whether their opinion would change if the witness knew that appellant had previously grabbed his wife and bruised her arm.  Later, outside the presence of the jury, in response to defense counsel's objections, the court ruled that the prosecution could ask the question if she had "a good faith belief that the conduct, which is the subject of the question, occurred."

At the conclusion of the defense case, the court and counsel discussed the matter again.  Defense counsel requested an admonition to the jury that the questions asked of both appellant and others were not evidence.  The court asked whether defense counsel wanted the court "to highlight" the particular questions or "do that generally."  Defense counsel requested that "it just be generally."  The court noted that it had already done that, FN14 but would do it again at the conclusion of the case.  The court asked "[w]ould that be sufficient?"  Defense counsel responded in the affirmative.

> FN14  The court pre-instructed the jury that "Nothing that the attorneys say is evidence.  In their opening statements and closing arguments the attorneys will discuss the case, but their remarks are not evidence.  Their questions during the trial are not evidence.  Only the witnesses' answers are evidence.  The attorneys' questions are significant only if they help you to understand the witnesses' answers.  Do not assume that something is true just because one of the attorneys asked a question that suggests it's true."

Just before closing argument, the court again instructed the jury as follows: "At this time, ladies and gentlemen, the attorneys are given an opportunity to argue the case.  I'll remind you once again what the attorneys have to say is not evidence.  *Their questions aren't evidence*; what they say [sic] during their opening statements to you were [sic] not evidence; and now, in the case of closing argument, their statements, again, are not evidence" (Italics added.)

After the conclusion of closing argument, again the trial court instructed the jury that "Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence. *Their questions are not evidence*." (Italics added.)

*Gibson*, 2014 WL 1278631, at *17-18.

**Legal Standard**

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth

Amendment right to counsel, which guarantees not only assistance, but effective assistance of

1    counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any

2    claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning

3    of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id*.

4        In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must

5    establish two things. First, he must establish that counsel's performance was deficient, i.e., that it

6    fell below an "objective standard of reasonableness" under prevailing professional norms.

7    *Strickland*, 466 U.S. at 687-88. Second, he must establish that he was prejudiced by counsel's

8    deficient performance, i.e., that "there is a reasonable probability that, but for counsel's

9    unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "A

10    reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

11    **Discussion**

12        The California Court of Appeal discussed the relevant law and denied this claim:

> Appellant argues that there is "lack of any conceivable tactical
> reason why counsel would have chosen to forego a jury instruction
> on a point which he clearly felt strongly about." Respectfully, we
> disagree. Appellant has failed to overcome the presumption that,
> under the circumstances, the challenged omission could be
> considered sound trial strategy. (*People v. Duncan* (1991) 53 Cal.
> 3d 955, 966.) The instruction that appellant argues should have
> been requested would have added very little to the instruction that
> the court gave three times in this case. Defense counsel could have
> reasonably concluded that the court's instruction-given three times-
> that the attorneys' questions during trial were not evidence was
> adequately conveyed to the jury. Accordingly, appellant has not
> surmounted the first hurdle in his ineffective assistance of counsel
> claim.

*Gibson*, 2014 WL 1278631, at *19.

       Gibson has not shown that the state court denial was an unreasonable application of

Supreme Court authority. While trial counsel did not request the specific jury instruction cited by

Gibson, he did request a general instruction stating that questions asked by the attorneys were not

evidence. Gibson has not demonstrated that trial counsel requesting the general instruction was

deficient. Even if trial counsel's actions were deficient, Gibson cannot show prejudice. On

multiple occasions the trial court instructed jurors that nothing that the attorneys say is evidence.

There is no support for Gibson's contention that had jurors been specifically informed that

1    questions regarding whether he had engaged in certain conduct directed towards his character

2    witnesses were not evidence then there was a reasonable probability that the verdict would have

3    been different.  It was undisputed that Gibson killed his wife and there was a great deal of

4    evidence to support second degree murder.  This claim is meritless and is denied.

5    **IV.        CUMULATIVE ERROR**

6         Gibson argues that he is entitled to habeas relief due to the cumulative effect of the errors

7    from the claims above.

8         **Legal Standard**

9         In some cases, although no single trial error is sufficiently prejudicial to warrant reversal,

10   the cumulative effect of several errors may still prejudice a defendant so much that his conviction

11   must be overturned.  *See Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing

12   conviction where multiple constitutional errors hindered defendant's efforts to challenge every

13   important element of proof offered by prosecution).

14        Cumulative error is more likely to be found prejudicial when the government's case is

15   weak.  *See*, *e.g.*, *Thomas v. Hubbard*, 273 F.3d 1164, 1179-80 (9th Cir. 2002), *overruled on other*

16   *grounds by Payton v. Woodford*, 299 F.3d 815, 829 n.11 (9th Cir. 2002) (noting that the only

17   substantial evidence implicating the defendant was the uncorroborated testimony of a person who

18   had both a motive and an opportunity to commit the crime).  However, where there is no single

19   constitutional error existing, nothing can accumulate to the level of a constitutional violation.  *See*

20   *Hayes v. Ayer*s, 632 F.3d 500, 524 (9th Cir. 2011).  Similarly, there can be no cumulative error

21   when there has not been more than one error.  *United States v. Solorio*, 669 F.3d 943, 956 (9th Cir.

22   2012).

23        **Discussion**

24        The California Court of Appeal rejected this stating, "[w]e have either rejected appellant's

25   claims of error and/or found that any errors were not prejudicial.  Viewed cumulatively, we find

26   that any errors do not warrant reversal of the judgment."  *Gibson*, 2014 WL 1278631, at *19.  This

27   finding is not unreasonable, and this Court has not found any constitutional errors let alone

28

United States District Court
Northern District of California

multiple errors that cumulatively would allow for reversal.  *See Hayes*, 632 F.3d at 524.

Moreover, there was overwhelming evidence of Gibson's guilt.  This claim is denied.

## V.       CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court

that issues an order denying a habeas petition to either grant or deny therein a certificate of

appealability.  *See* Rules Governing § 2254 Cases, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a

substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the

certificate must indicate which issues satisfy this standard.  *Id*. § 2253(c)(3).  "Where a district

court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c)

is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district

court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S.

473, 484 (2000).

Here, petitioner has made no showing warranting a certificate and so none is granted.

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED**.  A Certificate

of Appealability is **DENIED**.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

**IT IS SO ORDERED.**

Dated: January 26, 2016

_____
JAMES DONATO
United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DAN M. GIBSON,

          Plaintiff,

    v.

JOE A. LIZARRAGA,

          Defendant.

Case No.  14-cv-03717-JD

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on January 26, 2016, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Dan M. Gibson ID: AK-2511
Mule Creek State Prison
P.O. Box 409099
Ione, CA 95640

Dated: January 26, 2016

Susan Y. Soong
Clerk, United States District Court

By:
LISA R. CLARK, Deputy Clerk to the
Honorable JAMES DONATO